UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUAN WALKER,

    Petitioner,                      CASE NO. 2:07-CV-14133
                                           HONORABLE MARIANNE O. BATTANI
v.                                  UNITED STATES DISTRICT JUDGE

SHIRLEY A. HARRY,

    Respondent,
_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING IN PART AND DENYING IN PART A CERTIFICATE OF APPEALABILITY

Juan Walker, ("Petitioner"), presently confined at the Alger Correctional Facility in Munising, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his application, filed by attorney Richard B. Ginsberg, petitioner challenges his conviction for first-degree murder, M.C.L.A. 750.316; and possession of a firearm in the commission of a felony, M.C.L.A. 750.227b. For the reasons stated below, the application for writ of habeas corpus is **DENIED.**

### I. Background

Petitioner was convicted of the above charges following a jury trial in the Wayne County Circuit Court. Petitioner's counsel has provided a detailed

1

statement of facts in his petition for writ of habeas corpus.[1]  Respondent has likewise provided a detailed factual summary of the case, which does not essentially conflict with the petitioner's statement of facts.[2]  Because the facts of this case have been repeated numerous times, they need not be repeated here in their entirety.  Therefore, only a brief overview of the facts is required. *See Nevers v. Killinger,* 990 F. Supp. 844, 847 (E.D. Mich. 1997).

Tommy Lee Baines was shot and killed while he sat in his car as he was exiting a car wash on Hoover Road in Detroit, Michigan on June 13, 2000.  Two teenage girls witnessed the shooting.  Police officers testified that one of the young women, Corietta Parker, told them shortly after the shooting that a classmate, Treye Jones, was the shooter.  At trial, Parker denied that she had made this statement to the police, although she did state that Jones was one of the men who was present with the shooter.  Parker was unable to identify petitioner as being the shooter.  Parker described the shooter to the police as weighing 150 pounds, with a low cut haircut, and with a skin complexion much darker than petitioner's.

Shavonte McQueen was the other teenage girl who witnessed the shooting.  McQueen positively identified petitioner at trial as being the shooter.

---

[1]  *See* Brief in Support of Petition for Writ of Habeas Corpus, pp. 1-6 [This Court's Dkt Entry # 1].

[2]  *See* Respondent's Answer to Petition for Writ of Habeas Corpus, pp. 1-12 [This Court's Dkt Entry # 7].

McQueen admitted that she never observed petitioner in a lineup or photographic showup. McQueen first observed petitioner sixteen months after the shooting sitting in the courtroom when she appeared to testify two days before she actually testified. McQueen described the shooter to the police as dark complected, heavy build, and bald. McQueen acknowledged that petitioner was medium, not heavy build, that he was light complected, that the shooter was "much darker" when she saw him than petitioner, and that petitioner was not bald at the time of trial.

The deceased's godmother, Anderina Wilson, testified that petitioner came to her home in either 1999 or 2000, and requested the return of certain items that the victim had stolen from him. Petitioner also told Wilson that he was going to kill the victim. Wilson stated that petitioner was carrying a gun on the right side of his pants. Wilson acknowledged that she did not inform the police of this incident until the time scheduled for the preliminary examination.

The victim's mother, Denise Baines, testified that her son admitted to her that he had stolen petitioner's automobile. She had this conversation after somebody in a red Jeep fired a shot at her son in November of 1999.

Denise Baines testified that her son died on June 17, 2000, while at St. John Holy Cross Hospital, where he had been hospitalized for four days. Baines went to the hospital after her son was shot. After speaking with the doctors, Baines was concerned for her son's life and was not allowed to actually see him

3

until his second day in the hospital. When she visited her son on the second day, he was comatose. When Baines first visited her son, he was in the intensive care unit. Baines' son had two surgeries performed on him while he was in the hospital. On June 16, 2000, the third day that her son was in the hospital, Baines was in her son's room with her sister, Shannon Everett. This was between 4:00 and 5:00 p.m. Baines testified that her son was able to open his eyes, and, when she spoke to him, he could respond to her. Baines and her sister began praying with her son. Baines asked God to keep her son with them. While praying, Baines held her son's hand. Baines testified that he was able to squeeze her hand. Baines testified that her son's eyes were open and he was looking at her. Baines testified that when she would say something to her son, he would look at her, and, when her sister would say something to him, he would look at her. The victim had a tube that was going into his mouth, which prevented him from speaking. He also had intravenous lines hooked up to him and there were electronic monitors in the room. After the women finished praying, Baines asked her son if Juan had done this; the victim shook his head in the affirmative, in an up-and-down motion. The victim died the following morning. Shannon Everett's testimony was similar to Denise Baines' testimony, except that she testified that she saw fear in her nephew's eyes.

Dr. Victoria Navarra operated twice on the victim. Dr. Navarra testified that the victim was awake and was able to respond to stimuli while in the

intensive care unit. Dr. Navarra was able to communicate with the victim, as he would squeeze her hand in response to questions. Dr. Navarra further testified that on June 16, 2000, it would have been possible for the victim to respond to yes or no questions, and he would have been able to move his head up-and-down and side-to-side, in a yes or no manner. With respect to June 16, 2000, Dr. Navarra reviewed her own progress notes and the notes of the nurses. The medical records for June 16, 2000, contain nurses' notes, which state that "patient wakes up on verbal stimuli, and he opens his eyes and he squeezes hand on command," and the critical care progress notes state that "[patient] squeezes hand and opens his eyes."

Petitioner's conviction was affirmed on appeal. *People v. Walker,* No. 239711(Mich.Ct.App. March 1, 2005)(Levin, J., dissenting); *lv. den.* 474 Mich. 902; 705 N.W. 2d 133 (2005); *cert. den. Sub nom Walker v. Michigan,* 549 U.S. 844 (2006). Petitioner seeks a writ of habeas corpus on the following grounds:

> I. A writ of habeas corpus should be granted because testimony at Petitioner's trial regarding an inculpatory extra-judicial statement denied Petitioner his Sixth and Fourteenth Amendment right to confront the witnesses against him.
>
> II. The Sixth and Fourteenth Amendments require that the writ be granted because trial counsel's deficient performance denied Petitioner the effective assistance of counsel where counsel's performance fell below an objective standard of reasonableness and Petitioner was actually prejudiced by counsel's deficient performance.

## II. Standard of Review

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. An "unreasonable application" occurs when the state court identifies the correct legal principle from a Supreme Court's decision but unreasonably applies that principle to the facts of the prisoner's case. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

## III. Discussion

### A. Claim # 1. The Confrontation Clause claim.

Petitioner first contends that the his Sixth Amendment right to confrontation was violated when the trial court permitted the victim's affirmative nod in response to his mother's question about the identity of his assailant to be admitted as a dying declaration.

To the extent that petitioner is alleging that the trial court erred in determining that the victim's nod qualified as a dying declaration under Michigan law, he would not be entitled to habeas relief. Violations of state law and procedure which do not infringe specific federal constitutional protections are not cognizable claims under Section 2254. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Errors in the application of state law, especially rulings regarding the admissibility of evidence, are usually not questioned by a federal habeas court. *Seymour v. Walker,* 224 F. 3d 542, 552 (6th Cir. 2000).

What is or is not hearsay evidence in a state court trial is governed by state law. *See Johnson v. Renico,* 314 F. Supp. 2d 700, 705 (E.D. Mich. 2004)(internal citations omitted). The state court's ruling that the victim's affirmative nod identifying petitioner as his assailant qualified as a dying declaration cannot be questioned by this Court on federal habeas review. *See Bell v. Arn*, 536 F.2d 123, 125-26 (6th Cir. 1976); *See also Pippin v. Dretke,* 434 F.3d 782, 793-94 (5th Cir. 2005).

7

Moreover, the Michigan Court of Appeals' determination that the victim's nod qualified as a dying declaration was not an unreasonable determination of the facts. Petitioner's primary contention is that the victim's affirmative response to his mother's question about the identity of his assailant did not qualify as a dying declaration because the statement was not made under an impending sense of death. In rejecting petitioner's claim, the Michigan Court of Appeals ruled:

> The victim had been shot multiple times. He had undergone two surgeries in two days to control his bleeding. He was in the intensive care unit, could not talk as tubes were down his throat, and could not move his lower extremities. The victim was not administered pain medication after his second surgery because his blood pressure and other vital signs were unstable. There was testimony that family members were praying with the victim immediately before the statement was made, and that the victim had "complete fear in his eyes." Dr. Navarra testified that she was more concerned about his health than who shot him. The victim died the following morning, on June 17, 2000. It cannot be concluded that an unprejudiced person, considering the facts on which the trial court acted, would say there was no justification or excuse for the ruling. There was no abuse of discretion in allowing the evidence.
> *Walker,* Slip. Op. at * 5.

In order for a statement to be admissible as a dying declaration, it must be shown that the statement was made "under a sense of impending death." *Mattox v. U. S.* 146 U.S. 140, 151 (1892). This showing may be made "from what the injured person said; or from the nature and extent of the wounds inflicted being obviously such that he must have felt or known that he could not survive; as well as from his conduct at the time and the communications, if any, made to him by

8

his medical advisers, if assented to or understandingly acquiesced in by him." *Id.* The length of time which elapses between the making of the declaration and the declarant's death is one of the elements to be considered, although, "'it is the impression of almost immediate dissolution, and not the rapid succession of death, in point of fact, that renders the testimony admissible.'"*Id.* (internal quotation omitted). A person's fear or belief that his or her illness will end in death will not qualify the statement as a dying declaration. *Shepard v. U.S.,* 290 U.S. 96, 100 (1933). Instead, "[T]here must be 'a settled hopeless expectation' that death is near at hand, and what is said must have been spoken in the hush of its impending presence." *Id.* (internal quotation omitted). Nonetheless, a declarant's "despair of recovery" may be gathered from the circumstances if the facts support the inference. *Id.*

In the present case, the victim's sense of impending death could be inferred from the fact that he gave his affirmative response to his mother while he was in the intensive care unit after undergoing two emergency surgeries for gunshot wounds. The victim had a tube down his throat, was unable to move his extremities, and was unable to be given pain medication because his condition was unstable. The victim gave his response after his mother and aunt prayed over him for God to keep the victim with them. Finally, the victim died the next day. Under the circumstances, the Michgan Court of Appeals' determination that the remark qualified as a dying declaration was not unreasonable. See *Webb v.*

*Lane,* 922 F. 2d 390, 396 (7th Cir. 1991)(declarant's sense of impending death could be inferred, for purpose of "dying declarations" exception to hearsay rule, from fact that statements were made while he was in hospital emergency room suffering from bullet wounds to chest and abdomen, after he had been informed of doctor's belief that his chances for survival were not especially good, and approximately six hours after he had informed relatives that he believed he would die).

Petitioner also claims that the statement did not qualify as a dying declaration because there is no showing that the victim had any personal knowledge that petitioner was his actual assailant. The personal knowledge requirement was addressed, although not resolved, in *Shepard v. United States*, *supra.* In that case, the Supreme Court left open the question of whether a dying declaration should be admitted when there is "a legitimate inference that there was the opportunity for knowledge" that gave rise to the statement. *Id.* at 102. Because there is no clearly established Supreme Court law which requires that a statement must be based on personal knowledge to qualify as a dying declaration, the admission of petitioner's statement as a dying declaration was not contrary to clearly established federal law.

This Court further determines that the admission of this dying declaration did not violate petitioner's Sixth Amendment rights. Out of court statements that are testimonial in nature are barred by the Sixth Amendment Confrontation

10

Clause unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable by the court. *See Crawford v. Washington,* 541 U.S. 36 (2004). The Supreme Court, however, indicated that dying declarations may be an historical exception to the rule against the admission of hearsay testimony:

> The one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed.... Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis*.
> *Id.* at 56 n. 6.

The Supreme Court has recently reiterated its recognition of this long-standing exception to the exclusion of testimonial dying declaration statements in *Giles v. California*,128 S.Ct. 2678, 2682-83 (2008)("We have previously acknowledged that two forms of testimonial statements were admitted at common law even though they were unconfronted. The first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying." (internal citation omitted)). Prior to *Crawford,* the United States Supreme Court had likewise determined that the admission of a dying declaration does not violate a criminal defendant's right to confrontation. *See Pointer v. Texas,* 380 U.S. 400, 407 (1965)(dying declarations are admissible

against an accused); *Mattox v. United States*, 146 U.S. at 151-52 (1892)(same). Because "[T]he hearsay exception for dying declarations has been recognized by the Supreme Court since at least 1892[.]" the admission of the victim's dying declaration did not violate petitioner's rights under the Confrontation Clause. *See Byrd v. Collins,* 209 F.3d 486, 528 (6th Cir. 2000); *Pippin,* 434 F. 3d at 793.

Petitioner's Confrontation Clause claim also fails because the victim did not make his dying declaration to law enforcement but to family members. The Confrontation Clause is not implicated, and thus does not need not be considered, when non-testimonial hearsay is at issue. *See Davis v. Washington*, 547 U. S. 813, 823-26 (2006); *See also Desai v. Booker,* 538 F.3d 424, 425-26 (6th Cir. 2008). Testimonial statements do not include remarks made to family members or acquaintances, business records, or statements made in furtherance of a conspiracy. *Crawford,* 541 U.S. at 51-52, 56. In holding that the Sixth Amendment right to confrontation does not apply to non-testimonial statements, the Supreme Court stated:

> "The text of the Confrontation Clause reflects this focus [on testimonial hearsay]. It applies to 'witnesses' against the accused-in other words, those who 'bear testimony.' 1 N. Webster, An American Dictionary of *824 the English Language (1828). 'Testimony,' in turn, is typically 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.' *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."
> *Davis,* 547 U.S. at 823-24 (*quoting Crawford,* 541 U.S., at 51).

The victim's affirmative nod to his mother and aunt does not constitute

"testimonial" hearsay under *Crawford*. *See Doan v. Carter*, 548 F.3d 449, 458 (6th Cir. 2008)(victim's statements to family and friends regarding abuse she had received at hands of petitioner not testimonial); *United States v. Franklin*, 415 F.3d 537, 545-46 (6th Cir. 2005)(citing cases)(casual statements to family and acquaintances nontestimonial under *Crawford*). Petitioner is not entitled to habeas relief on his first claim.

**B. Claim # 2. The ineffective assistance of counsel claim.**

Petitioner next contends that he was deprived of the effective assistance of trial counsel. Petitioner alleges that he was denied effective assistance of counsel because his attorney failed to call Dr. Carl Fowler to testify that the victim was comatose and unresponsive during his hospital stay and for failing to call his investigator Herbert Friedman to impeach Dr. Navarra's trial testimony that the victim was alert and responsive while he was in the intensive care unit. Petitioner claims that this evidence would have called into question the testimony of Denise Baines and Shannon Everett that the victim was able to respond to Baines' question about the identity of his killer while he was in the hospital.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court set forth a two-pronged test for determining whether a habeas petitioner has received the ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. This requires a showing

that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. *Id.* at 687. Second, the petitioner must establish that the deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal. *Id.* A habeas petitioner is entitled to habeas relief on an ineffective assistance of counsel claim only if the state court's resolution of the ineffective assistance of counsel claim involved an unreasonable application of *Strickland. See Byrd v. Trombley,* 580 F. Supp. 2d 542, 561 (E.D. Mich. 2008).

Petitioner's case was remanded by the Michigan Court of Appeals to the Wayne County Circuit Court for a *Ginther* [3] hearing, which was held on October 31, 2003. After hearing testimony from petitioner's trial counsel and his investigator, the trial court judge denied petitioner's motion for a new trial. Significantly, neither Dr. Fowler or Dr. Navarra was called to testify at the *Ginther* hearing. [4]

In rejecting petitioner's claim on direct appeal, the Michigan Court of Appeals found that assuming that counsel was deficient for failing to call Dr. Fowler or the investigator, petitioner was not prejudiced by this failure:

Having reviewed the transcript, we find that, assuming counsel's

---

[3] *People v. Ginther*, 390 Mich. 436; 212 NW2d 922 (1973).

[4] Both the transcript from the *Ginther* hearing and the trial court's opinion denying petitioner's motion for a new trial are included in the Rule 5 materials from the Michigan Supreme Court, Part A. [See this Court's Dkt. # 8-5].

14

performance to be deficient, defendant failed to demonstrate prejudice, or in other words, defendant did not establish a reasonable probability that the result of the proceeding would have been different. At the *Ginther* hearing, trial counsel and the investigator testified regarding the investigator's interviews with Drs. Fowler and Navarra that were conducted more than a year after the victim's treatment in the hospital. Both doctors allegedly indicated that the victim was unresponsive and comatose during the entire hospital stay. This would directly contradict Dr. Navarra's testimony at trial. Trial counsel testified that he should have called Dr. Fowler to the stand at trial and should have attempted to impeach Dr. Navarra, which matters were critical to the defense. According to the investigator, he had the victim's medical records with him when he interviewed the doctors, and he made those records available if the doctors wished to review them in answering questions. However, Dr. Fowler did not review the records but was adamant that the victim was totally unresponsive, and the investigator could not recall if Dr. Navarra reviewed the records when answering questions during the interview. Dr. Navarra was short with the investigator, and she did not want to be interviewed but did so reluctantly.

The medical records support Dr. Navarra's trial testimony that the victim was awake, alert, and responsive during various parts of his hospitalization. Dr. Fowler himself, in a consultation report admitted into evidence along with the victim's other medical records, wrote that "[the victim] was taken to the CAT scan suite and at that time the patient started complaining of severe abdominal pain, was combative and pulled out his lines." If Dr. Fowler had testified, he may have testified consistent with the interview report generated by the investigator and may have been able to logically explain why the medical records were not inconsistent with his opinion or why the records were somehow negated from a medical viewpoint. It is possible, however, that Dr. Fowler may have changed his position or opinion on review of the medical records or after having considered the matter in greater detail. Further, it is possible that Dr. Fowler may have denied or qualified the contents of the investigator's report, which was produced from the investigator's notes and not on the basis of any type of audio or video recording. In that case, his testimony would have further damaged the defense. The same can be said regarding Dr. Navarra had their been an attempt to impeach her testimony. Therein lies the problem; defendant did not present the testimony of either doctor at the *Ginther* hearing and thus failed to show prejudice.

*******************************************************************************
> Here, there was also no explanation why the doctors were not called to testify at the *Ginther* hearing even after the prosecutor emphasized their lack of presence to the trial court. We cannot definitively conclude that Dr. Fowler would have testified in defendant's favor at trial, or that Dr. Navarra would have been successfully impeached. Moreover, other evidence pointed to defendant's guilt, including an ongoing feud between defendant and the victim, a death threat against the victim made by defendant, a prior shooting involving defendant and the victim, and an eyewitness claim that defendant was the perpetrator of the fatal shooting. On this record, reversal is unwarranted.
>
> *Walker,* Slip. Op. at * 2-3.

As an initial matter, petitioner failed to call Dr. Fowler or Dr. Navarra to testify at the *Ginther* hearing. Petitioner has offered, neither to the Michigan courts or to this Court, any evidence beyond Herbert Friedman's hearsay testimony, as to what the testimony of Dr. Fowler or Dr. Navarra would have been. In the absence of such proof, petitioner is unable to establish that he was prejudiced by counsel's failure to call Dr. Fowler to testify at trial, or for failing to attempt to impeach Dr. Navarra's trial testimony, so as to support his ineffective assistance of counsel claim. *See Clark v. Waller,* 490 3d 551, 557 (6th Cir. 2007). Because Dr. Fowler and Dr. Navarra did not testify at the *Ginther* hearing, this Court may not hold an evidentiary hearing to permit petitioner the opportunity to develop what his testimony would have been because he "failed" to develop the evidentiary support for this claim in state court, as required by 28 U.S.C. § 2254(e)(2). *See Williamson v. Raney*, 157 F. Supp. 2d 880, 892 (W.D. Tenn. 2001).

In addition, petitioner has failed to show that the outcome of the trial would have been different had Dr. Fowler or Herbert Friedman been called to testify at trial. Herbert Friedman interviewed Dr. Fowler and Dr. Navarra over a year after they had treated the victim. Neither doctor reviewed the medical records before they spoke with Friedman, calling into question the reliability of their purported statements that the victim was comatose for his entire stay at the hospital. The medical notes, in fact, indicated that there were times at the hospital when the victim was alert and responsive. Dr. Fowler's own medical notes, in fact, wrote that "[the victim] was taken to the CAT scan suite and at that time the patient started complaining of severe abdominal pain, was combative and pulled out his lines." If Dr. Fowler had testified, he could have been impeached with his own medical notations which showed that the victim was, in fact, responsive and awake for some periods of time while at the hospital. More importantly, when Dr. Navarra testified at trial, her testimony that the victim was alert and conscious while at the hospital was based primarily on her review of these same medical records, and not her own independent recollections.

In the present case, petitioner is not entitled to habeas relief on his ineffective assistance of counsel claim because he has failed to establish that it was medically impossible for the victim to make his dying declaration to his mother and aunt. *See Robinson v. Folino,* No. 2009 WL 1066002, * 10 (W.D. Pa. April 20, 2009). Even if there were periods of time that the victim was comatose,

17

this would not necessarily call into question the testimony by Denise Baines and Shannon Everett that the victim was able to respond to Baines' question about the identity of his killer. "Because it is reasonable to conclude that the condition of a seriously injured victim could dramatically change within minutes," counsel's failure to present the testimony of Dr. Fowler or Herbert Friedman to impeach Dr. Navarra's trial testimony that the victim was alert and awake at times during his hospital stay was not ineffective. *See People v. Hatchett*, 397 Ill.App.3d 495, 505; 922 N.E.2d 474; 337 Ill.Dec. 351 (Ill. App. 2009). Petitioner is not entitled to habeas relief on his second claim.

### IV. Conclusion

The Court will deny the petition for writ of habeas corpus. The Court will, however, grant petitioner a certificate of appealability with respect to his Confrontation Clause claim. In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-484 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the

this would not necessarily call into question the testimony by Denise Baines and Shannon Everett that the victim was able to respond to Baines' question about the identity of his killer. "Because it is reasonable to conclude that the condition of a seriously injured victim could dramatically change within minutes," counsel's failure to present the testimony of Dr. Fowler or Herbert Friedman to impeach Dr. Navarra's trial testimony that the victim was alert and awake at times during his hospital stay was not ineffective. *See People v. Hatchett*, 397 Ill.App.3d 495, 505; 922 N.E.2d 474; 337 Ill.Dec. 351 (Ill. App. 2009). Petitioner is not entitled to habeas relief on his second claim.

### IV. Conclusion

The Court will deny the petition for writ of habeas corpus. The Court will, however, grant petitioner a certificate of appealability with respect to his Confrontation Clause claim. In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-484 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the

constitutional claims to be debatable or wrong. *Id.* at 484. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

Although the Court believes that its decision in denying petitioner habeas relief was correct, it will nonetheless grant petitioner a certificate of appealability on his Confrontation Clause claim for the following reason. Judge Levin dissented from the Michigan Court of Appeals' majority opinion because he believed that the trial court violated petitioner's Confrontation Clause rights by introducing the victim's affirmative response to his mother into evidence. In light of the fact that Judge Levin dissented from the majority opinion and indicated that he would have reversed petitioner's conviction, petitioner has shown that jurists of reason could decide the Confrontation Clause issue differently or that the issue deserves encouragement to proceed further. *See Robinson v. Stegall,* 157 F. Supp. 2d 802, 820, n. 7 & 824 (E.D. Mich. 2001)(habeas petitioner entitled to certificate of appealability from district court's determination that state appellate court reasonably applied federal law in determining that any Confrontation Clause error was harmless, where one judge on the Michigan Court of Appeals dissented and indicated that he would have reversed petitioner's conviction; dissent showed that a reasonable jurist found that the issue should have been decided differently). The Court will grant a certificate of

19

appealability on petitioner's first claim, because petitioner's Confrontation Clause claim has made a substantial showing of denial of constitutional right.

The Court will deny petitioner a certificate of appealability on his ineffective assistance of counsel claim, because jurists of reason would not find this Court's resolution of that claim to be debatable. *See Skaggs v. Parker*, 235 F. 3d 261, 266 (6th Cir. 2000).

## IV. ORDER

Based upon the foregoing, IT IS ORDERED that the Petition for a Writ of Habeas Corpus is **DENIED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that a certificate of appealability is **GRANTED** with respect to petitioner's first claim involving the alleged violaton of his right to confrontation and is **DENIED** with respect to his remaining claim.

s/Marianne O. Battani  
**HON. MARIANNE O. BATTANI**  
**UNITED STATES DISTRICT COURT**

DATED: July 15, 2010

## CERTIFICATE OF SERVICE

I hereby certify that on the above date a copy of this Opinion and Order was served upon all Counsel of Record.

s/Bernadette M. Thebolt  
Case Manager